## STATE OF CONNECTICUT *v.* CEDRIC EDWARDS (14756)

PETERS, C. J., and CALLAHAN, BERDON, NORCOTT and PALMER, Js.

Argued May 23—decision released July 25, 1995

*Susan M. Hankins*, assistant public defender, for the appellant (defendant).

*John A. East III*, deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Mary Elizabeth Baran*, assistant state's attorney, for the appellee (state).

PALMER, J. The defendant, Cedric Edwards, was convicted by a jury of murder in violation of General Stat-

utes § 53a-54a.[1] On appeal,[2] the defendant claims that the trial court improperly refused to instruct the jury on his claim of self-defense. We agree and, therefore, reverse the judgment of the trial court.

The following facts are undisputed. At approximately 1 p.m. on February 25, 1991, as the defendant, Quincy Hough and Shannon Lee were walking down Eastern Street in New Haven, they observed an automobile moving slowly toward them. The car, which was operated by Todd Reynolds and contained a lone passenger, Devlin Prescott, continued past the three men and disappeared from their view. Several minutes later, however, the car returned, this time with two additional occupants, Tracey Rumley and Raymond Barrows (victim).

As the car approached the three men, the victim, who was seated in the back seat of the vehicle, told Reynolds to pull over because he wanted to speak to the defendant. Reynolds did so, and the victim exited from the rear passenger seat, walked behind the car and proceeded across the street toward the defendant. The vic-

[1] General Statutes § 53a-54a provides in relevant part: "MURDER. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime. . . .

"(c) Murder is punishable as a class A felony . . . ."

[2] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony . . . for which the maximum sentence which may be imposed exceeds twenty years . . . ."

tim had both hands in his jacket pockets as he approached the defendant. After a brief verbal confrontation with the victim, the defendant withdrew a handgun from his pocket and fired five shots into the victim, fatally wounding him.[3]

The defendant fled on foot, but was soon apprehended and detained by the police in the parking lot of the Alling municipal golf course, about one mile from the scene of the shooting. Following the defendant's capture, the police transported Lee, Rumley and Hough to the golf course parking lot, where they identified the defendant as the shooter. The police subsequently arrested the defendant for murder.

The defendant testified at trial and admitted that he had shot and killed the victim. He claimed, however, that he had done so in self-defense.[4] In support of his

---

[3] The police found five empty .25 caliber shell casings at the scene of the shooting, but never recovered the gun used by the defendant to kill the victim.

[4] Self-defense is defined in General Statutes § 53a-19, which provides: "USE OF PHYSICAL FORCE IN DEFENSE OF PERSON. (a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform.

"(c) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause

defense, the defendant testified to a series of events that, he claimed, caused him to believe that he was in serious and imminent danger when the victim approached him moments before the shooting.[5] According to the defendant, he and Rumley, a close friend of the victim's, had had a fistfight on or about Thanksgiving Day in 1990, over Rumley's failure to pay the defendant for some marijuana that Rumley had obtained from the defendant. Several days thereafter, the defendant was informed by his sister, Vicki Joyner, that she had been attacked and badly beaten by a group of people, including Rumley, Rumley's sister, and the victim, in retribution for the defendant's altercation with Rumley. Joyner also told the defendant that, immediately after the beating, she had been instructed by the victim to tell the defendant "when we see him, he's through."[6] Joyner testified as a witness for the defendant and corroborated the defendant's version of the events.[7]

The defendant further testified that he had attended a birthday party at the home of his girlfriend, Denise Moye, on January 16, 1991. The victim's brother arrived at the party and instructed Moye to tell the defendant that he wished to speak to him. The defend-

---

physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law."

[5] The defendant testified that he had known the victim for ten to twelve years.

[6] The defendant claimed that he had decided to stay at a friend's house after his altercation with Rumley because the defendant thought that it would be unsafe to remain at his own home.

[7] Joyner testified that she had given the police a statement about the assault. On rebuttal, however, the state introduced evidence indicating that the police had no record of Joyner's complaint.

ant, fearful of a confrontation with the victim's brother because of the threat that had been made against him by the victim, ran to an upstairs bedroom. When he heard Moye yelling that the victim's brother had a gun, the defendant jumped from a second floor window and departed the area. The defendant claimed to have obtained a gun and bullets after this incident for protection against the victim and the victim's family and friends.

Moye testified concerning her knowledge of what had occurred at the party on January 16, providing detailed corroboration of the defendant's account. Moye further stated that she had also received a visit from the victim not long after her confrontation with the victim's brother. According to Moye, the victim, who was brandishing a handgun, told her that he would "kill all of ya" if Moye did not disclose the defendant's whereabouts. Later that evening, Moye informed the defendant of the victim's visit and that the victim had been armed and had threatened to kill Moye and her guests. She also told the defendant that the victim "was after him to kill him."[8] Raquel Reed, a friend of Moye's who was also present at the party, testified that she, too, had witnessed the victim point a gun at Moye and her guests, and that he had threatened to kill them. Reed further testified that she had heard Moye report to the defendant that the victim, armed with a handgun, had directed Moye to "[t]ell Cedric when [I] see him, [I'm] going to kill him."

The defendant also testified concerning the events immediately preceding the shooting.[9] He stated that

---

[8] Moye also testified that she had reported the incident to the police. Although a police officer testified at trial that he had interviewed Moye in connection with the incident, the officer also indicated that Moye had been unable to make a positive identification of the individuals who had threatened her.

[9] The defendant stated that he had stayed away from the vicinity of the Eastern Circle housing complex from January 16, 1991, until the day of

when he observed Reynolds' car return to the area with the victim as a passenger, he thought that Reynolds had sought the victim out to tell him of the defendant's whereabouts because he knew that the victim had been looking for him. The defendant also indicated that he was extremely frightened when he saw the victim exit Reynolds' car and walk toward him. According to the defendant, the victim confronted him and demanded to know "what's all this shit I hear you have been talking?" The defendant replied that there was no problem and that he, the defendant, did not want any trouble.[10] The victim rejected the defendant's overture to resolve their dispute peaceably, however, and instead raised the subject of the defendant's fight with Rumley, claiming that the defendant had "jumped my man." The defendant testified that although he had backed away as the victim moved toward him, the victim continued to close in on him until the two men were less than three feet apart. The defendant claimed that the victim had then appeared to turn and reach for something in his jacket pocket. The defendant stated that he had believed that the victim was reaching for his gun and that he had intended to shoot him.[11] The defendant further testified that he was overcome with fear and, as a result, had lost control of himself and had shot the victim. According to the defendant, he fled immediately after the shooting because he was afraid of retaliation by the victim's friends.[12]

---

the shooting on February 25, 1991, because he was afraid that he might run into the victim in that neighborhood. This testimony was corroborated by Shannon Lee, who was called as a witness by the state.

[10] The defendant stated that he told the victim "[j]ust chill, just ice it, man. There's no beef. I don't want no beef."

[11] The defendant also called Tamara Lee, Shannon Lee's sister, who testified that her brother had told her that the victim appeared to be reaching for something just before he was shot by the defendant.

[12] The defendant, who admitted to shooting the victim shortly after he was apprehended by the police, maintained then, as he did at trial, that he had shot the victim in self-defense.

The defendant also elicited testimony from two eyewitnesses who purported to have seen the victim in possession of a gun when he exited Reynolds' car and approached the defendant on Eastern Street. Reynolds testified that he had witnessed the victim place a pistol in one of the pockets of his leather jacket prior to exiting the car. Prescott, a passenger in Reynolds' car, also testified that the victim had a black handgun concealed in his jacket pocket when he encountered the defendant.[13]

Notwithstanding the testimony presented by the defendant, the trial court denied the defendant's request for a jury instruction on the elements of self-defense, concluding that the evidence introduced at trial was insufficient to warrant such an instruction. The jury thereafter returned a verdict of guilty, and the trial court sentenced the defendant to a term of imprisonment of sixty years.

On appeal, the defendant contends that he had adduced sufficient evidence at trial to raise a plausible claim of self-defense and, consequently, that the trial court's failure to instruct the jury on self-defense violated his federal constitutional right to due process of law.[14] We agree.

---

[13] At trial, the state introduced Reynolds' tape-recorded statement, given to the police two days after the shooting, in which Reynolds indicated that he had not known whether the victim was armed when he approached the defendant. The state also produced a tape-recorded statement by Prescott in which he told the police shortly after the shooting that the victim had not possessed a gun on the day he had been killed. The police did not find a gun in the victim's possession when they arrived at the scene.

[14] The defendant also claims that the trial court improperly: (1) precluded the testimony of a defense witness because the defendant had not provided the state with that witness' psychiatric records; (2) refused to allow the defendant to present evidence of the victim's criminal record in support of his claim of self-defense; (3) charged the jury on the element of intent to commit murder; (4) refused to instruct the jury on the defendant's affirmative defense of extreme emotional disturbance; and (5) instructed the jury

The legal principles applicable to the defendant's claim are well established. "[T]he fair opportunity to establish a defense 'is a fundamental element of due process of law' . . . ." *State* v. *Carter*, 228 Conn. 412, 427, 636 A.2d 821 (1994), quoting *Washington* v. *Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967). "This fundamental constitutional right includes proper jury instructions on the elements of self-defense so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the assault was not justified. See General Statutes § 53a-12 (a)."[15] *State* v. *Miller*, 186 Conn. 654, 660–61, 443 A.2d 906 (1982); see also *State* v. *Carter*, 232 Conn. 537, 545, 656 A.2d 657 (1995). Thus, "[i]f the defendant asserts [self-defense] and the evidence indicates the availability of that defense, such a charge is obligatory and the defendant is entitled, as a matter of law, to [an] . . . instruction [on self-defense]." *State* v. *Fuller*, 199 Conn. 273, 278, 506 A.2d 556 (1986). "Before an instruction is warranted, however, [a] defendant bears the initial burden of producing sufficient evidence to inject self-defense into the case. . . . To meet that burden, the evidence adduced at trial, whether by the state or the defense, must be sufficient [if credited by the jury] to raise a reasonable doubt in the mind of a rational juror as to whether the defendant acted in self-defense." (Citation omitted; internal quotation marks omitted.) *State* v. *Carter*, supra, 545. This burden is slight, however, and may be satisfied if there is "any foundation in the evidence [for the defendant's claim], no matter how weak or incredible . . . ." (Internal

on reasonable doubt. Because we reverse the judgment of conviction due to the trial court's failure to instruct the jury on the defendant's claim of self-defense, we do not address these issues.

[15] General Statutes § 53a-12 provides in relevant part: "DEFENSES; BURDEN OF PROOF. (a) When a defense other than an affirmative defense, is raised at a trial, the state shall have the burden of disproving such defense beyond a reasonable doubt."

quotation marks omitted.) Id., 546; *State* v. *Fuller*, supra, 278. Furthermore, in reviewing the trial court's rejection of the defendant's request for a jury charge on self-defense, "we must adopt the version of the facts most favorable to the defendant which the evidence would reasonably support." (Internal quotation marks omitted.) *State* v. *Lewis*, 220 Conn. 602, 619, 600 A.2d 1330 (1991).

Finally, "[i]n order sufficiently to raise self-defense, a defendant must introduce evidence that the defendant reasonably believed his adversary's unlawful violence to be 'imminent' or 'immediate.' W. LaFave & A. Scott, Handbook on Criminal Law (1972) § 53, p. 394. Under General Statutes § 53a-19 (a), a person can, under appropriate circumstances, justifiably exercise repeated deadly force if he reasonably believes both that his attacker is using or about to use deadly force against him and that deadly force is necessary to repel such attack. . . . The Connecticut test for the degree of force in self-defense is a subjective-objective one. The jury must view the situation from the perspective of the defendant. Section 53a-19 (a) requires, however, that the defendant's belief ultimately must be found to be reasonable." (Citation omitted; internal quotation marks omitted.) *State* v. *Carter*, supra, 232 Conn. 545–46.

Adopting the version of the facts most favorable to the defendant, the jury could have concluded that bad blood existed between the victim and the defendant, and that the victim, a violent person who carried a handgun, had threatened to kill the defendant on at least two occasions. Although the victim did not himself communicate these threats to the defendant, the jury could have credited the defense testimony that Joyner and Moye had, at the victim's direction, informed the defendant of the victim's hostile intentions. Given the defendant's explanation of the man-

ner in which he was approached by the victim and the victim's alleged furtive movements as he proceeded to within a few feet of the defendant, we cannot, in the context of the other defense testimony, conclude that the evidence introduced at trial was of "such a nature that the jury needed to resort to speculation that the defendant reasonably believed that [he] had to act in self-defense." Id., 549; *State* v. *Belle*, 215 Conn. 257, 275, 576 A.2d 139 (1990). Because the evidence, if believed, may have been sufficient to have raised a reasonable doubt in the mind of a rational juror as to whether the defendant had shot and killed the victim in self-defense, the defendant was entitled to a jury determination of his claim. The trial court, therefore, improperly rejected the defendant's request for an instruction on self-defense.

The judgment is reversed and the case is remanded to the trial court for a new trial.

In this opinion the other justices concurred.