# STATE OF CONNECTICUT *v.* JOHN CHRISTOPHER BARLETTA
## (15030)

Peters, C. J., and Borden, Berdon, Norcott and Palmer, Js.

314

Argued April 23—officially released July 30, 1996

*Susan M. Hankins*, assistant public defender, for the appellant (defendant).

*Harry Weller*, assistant state's attorney, with whom, on the brief, were *Eugene Callahan*, state's attorney, *Susan C. Marks*, supervisory assistant state's attorney, and *James Bernardi*, assistant state's attorney, for the appellee (state).

PALMER, J. A jury convicted the defendant, John Christopher Barletta, of murder in violation of General Statutes § 53a-54a (a) and attempted murder in violation of General Statutes §§ 53a-49 (a) and 53a-54a (a).[1] The defendant appeals[2] from the judgment of the trial court

---

[1] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

General Statutes § 53a-49 (a) provides: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[2] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters

sentencing him to an effective term of life imprisonment.[3] He claims that the trial court improperly: (1) precluded him from introducing into evidence expert medical testimony concerning the effects of cocaine on the cognitive abilities of an eyewitness to the crimes; (2) precluded him from introducing into evidence certain expert psychiatric testimony regarding a second state's witness on the ground that the information sought to be adduced was protected by the psychiatrist-patient privilege; (3) restricted his examination of several trial witnesses; and (4) refused to instruct the jury on reckless endangerment as a lesser included offense of attempted murder. We affirm the judgment of the trial court.

A jury reasonably could have found the following facts. On the evening of December 12, 1992, the defendant attended a party in Norwalk, where he met two men, Deandre Lofton and Adam Atkinson. The three men left the party together in the defendant's car and traveled to the intersection of Belle Avenue and South Main Street in Norwalk, where the defendant intended to purchase cocaine. Atkinson offered to take the defendant's money and purchase the cocaine on his behalf. The defendant agreed, handed Atkinson $20, and instructed him to buy two "cookies"[4] of cocaine. Atkinson then exited the car and met with Curtis Ricks, who agreed to serve as an intermediary between Atkinson and a crack cocaine dealer. Atkinson thereupon gave Ricks the defendant's $20 and Ricks departed the area. Shortly thereafter, Ricks returned with only one

shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony . . . for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[3] The defendant was sentenced to a term of life imprisonment on the murder count and to a concurrent prison term of twenty years on the attempted murder count.

[4] A "cookie" is street parlance for a small unit of crack cocaine.

cookie of cocaine, explaining that he had spent the entire $20 to obtain it. When the defendant learned that Ricks had purchased only one cookie and not two, the defendant became furious and demanded that Ricks either return his money or furnish him with an additional cookie. Ricks declined and warned the defendant and Atkinson to leave the area. The defendant responded by threatening to kill those who he believed were responsible for cheating him out of the additional cocaine. Although still enraged, the defendant was persuaded by his companions to leave the neighborhood.

The defendant, accompanied by Lofton and Atkinson, drove to his home, where he changed his clothing and retrieved an AK-47-type assault rifle. The three men next proceeded in the defendant's vehicle to a nearby school, whereupon the defendant exited his car and fired several shots into the adjacent woods. The men then returned to the vicinity of the intersection of Belle Avenue and South Main Street, where the defendant rolled down his car window and began indiscriminately to fire his rifle at the people on the street. Two persons were shot during the defendant's attack: Barbara McCrae was struck in the head and subsequently died of her wounds, and Karen Perry suffered a gunshot wound to the leg. Following the shootings, the defendant drove to the home of his girlfriend, June Davis, and admitted to her that he had fired upon the victims. Additional facts will be presented as necessary.

I

The defendant first claims that the trial court improperly excluded the testimony of a defense expert regarding the adverse effects of cocaine on the cognitive abilities of a person who ingests the drug, in violation of his rights under the confrontation clause of the sixth amendment to the United States constitution. Although we agree with the defendant that the trial court should

have admitted into evidence the expert testimony proffered by the defendant, we are not persuaded that the impropriety was of constitutional magnitude. Moreover, we conclude that the trial court's failure to allow the challenged testimony into evidence was harmless and, accordingly, that the exclusion does not entitle the defendant to a new trial.

The following additional facts are necessary to our resolution of this issue. Early in the evening of December 12, 1992, Perry purchased between one-half and one gram of cocaine, which she took with her to a "base house" in Norwalk to smoke.[5] Perry gave the proprietor of the base house about one half of the cocaine that she had just purchased and she smoked the rest of the cocaine herself over the next three to four hours. About thirty to forty minutes after she had finished ingesting the cocaine, Perry left the base house and proceeded to the corner of Belle Avenue and South Main Street, a five minute walk. There she met McCrae, with whom she stopped to talk.

While the two women were conversing, Perry noticed the defendant and another man walking toward a car parked nearby. She took particular notice of the defendant, a white male with long dreadlocks, because of his unusual appearance. Perry watched as the two men got into the parked car and drove away. About ten or fifteen minutes later, the car returned and screeched to a stop. Perry saw the defendant point a gun out of the car window and begin firing. At trial, Perry identified the defendant as the person who shot her.

After the state had rested its case, the defendant apprised the trial court that he intended to introduce

---

[5] On direct examination, Perry explained the term "base house": "You go there to do your drugs. It's like a spot you can go and get high. And, what you do is you give the person that lives there some of what you have so he'll let you stay there and get high. So, that's what I did. I gave him some of what I had, and I stayed there and I got high."

the expert testimony of Eliot Gardner[6] concerning the effects of cocaine on a person's cognitive abilities in order to impeach Perry's credibility. The defendant sought to elicit Gardner's testimony for two reasons: first, to establish that Perry had remained under the influence of cocaine even after the euphoria caused by the drug had abated, and second, to explain the cognitive impairment caused by the ingestion of cocaine, both generally and with respect to Perry. The state objected to Gardner's testimony on the grounds that it was irrelevant and speculative. To substantiate his claim of admissibility, the defendant then elicited testimony from Gardner outside the presence of the jury.

Gardner testified that there was "a very high degree of probability that [Perry] was under the influence of cocaine at the time [of the shooting]," that cocaine affects cognitive and perceptual abilities and the processes of memory storage and retrieval, and that there was "a high degree of probability that [Perry's] visual observations [at the time of the shooting] would be unreliable." At the conclusion of the defendant's voir dire examination of Gardner, the trial court ruled that Gardner could testify regarding "generalities concerning narcotics and particularly the effect it might have in impairing a person's ability to observe and correctly relate what he or she observed." The trial court, however, refused to allow Gardner to testify about the likely effect of the cocaine on Perry herself.[7]

---

[6] Gardner, who has a doctor of philosophy degree in neuroscience and physiological psychology, is a professor of psychiatry and neuroscience at the Albert Einstein College of Medicine in New York City. The state did not challenge his qualifications as an expert.

[7] The trial court, noting that the only testimony concerning the amount and quality of the cocaine ingested by Perry on the evening of the shooting had come from Perry herself, concluded that it would be inappropriate for Gardner to rely on certain portions of Perry's trial testimony in order to impeach her on another aspect of her testimony, namely, her identification of the defendant as the shooter. We express no view as to the propriety of this determination.

Immediately after the trial court's ruling, the state requested the opportunity to cross-examine Gardner outside the presence of the jury. The trial court granted the state's request and, on voir dire examination by the state, Gardner reiterated much of his direct testimony. He also testified in some detail, however, about cocaine-induced hallucinations. Specifically, he explained that there was a "high degree of probability that hallucinations may . . . [occur]" after a person has ingested between one-quarter and one-half gram of street quality cocaine, that published studies indicate that between 40 and 50 percent of cocaine users experience hallucinations, and that those persons with a history of cocaine abuse are more likely to experience hallucinations than less frequent users. At the conclusion of its voir dire examination of Gardner, the state renewed its objection to Gardner's testimony on the grounds that: (1) Gardner had no direct knowledge of Perry's condition on the evening of the shooting; (2) because cocaine affects people differently, Gardner could not testify with specificity how Perry's cognitive abilities were likely to have been impaired that evening; (3) Gardner's testimony was based upon the testimony of Perry, whom the defendant was attempting to impeach; and (4) Gardner could not testify that it was more probable than not that Perry's identification of the defendant as the shooter was the product of a hallucination.

The trial court, upon reconsideration of its earlier ruling, concluded that Gardner's testimony would be relevant only to explain any discrepancies between Perry's version of the shooting and any other accounts of the event. The trial court reasoned that because no witness had as yet contradicted Perry's testimony, Gardner's testimony was premature. Accordingly, the trial court denied the defendant's request to call Gardner as a witness, without prejudice to renewal if and

when the defendant elicited evidence to contradict Perry's account of the incident.

The defendant himself then testified before the jury. He testified that, although he had been present in the car at the time of the shooting, Atkinson, and not he, had fired the shots that struck McCrae and Perry. Following his testimony, the defendant once again sought to introduce Gardner's expert testimony regarding the effects of cocaine on perception. During his renewed offer of proof, the defendant stated, consistent with Gardner's earlier voir dire testimony, that Gardner would testify that it was more probable than not that a person who had ingested one-quarter to one-half gram of cocaine would suffer a cognitive deficit, and that the impairment could take the form of hallucinations, delusions, memory loss or incorrect processing of visual information. The state, in response, objected solely on the ground that Gardner's testimony regarding the possibility that Perry could have suffered hallucinations was speculative; the state did not specifically address the defendant's claim concerning the admissibility of Gardner's testimony as it related to the general effects of cocaine on cognition. The trial court, also focusing on Gardner's testimony that Perry's identification of the defendant as the shooter might have been the product of a hallucination, denied the defendant's request to call Gardner as a trial witness, concluding, as the state had argued, that Gardner's testimony regarding the possible hallucinatory effect of cocaine was too speculative.

The state maintains that the trial court properly excluded Gardner's testimony because he did not state that, in his opinion, *hallucinations* occur more than 50 percent of the time when a person ingests cocaine.[8]

---

[8] On appeal, as at trial, the state does not contend that Gardner's testimony was properly excluded because it would not have assisted the jury to understand the general effect of cocaine on cognition. Rather, the state again

This argument, however, misconstrues the import of Gardner's testimony. Although it is true that Gardner could not say that a person under the influence of cocaine is more likely than not to experience the type of complex visual hallucinations that would affect the reliability of his or her observations, Gardner repeatedly and unequivocally stated that hallucinations are but one of several different kinds of cognitive impairments likely to be caused by cocaine use. Furthermore, Gardner testified that there was a high degree of probability that Perry was under the influence of cocaine at the time of the shooting *and* that it was more likely than not that her visual observations at that time were unreliable due to her cocaine ingestion. Whether the jury would have credited such testimony is not the issue before us; the question, rather, is whether the testimony was reasonably likely to have assisted the jury in evaluating the reliability of one of the eyewitnesses to the crime. In light of the nature of Gardner's testimony, we must answer that question in the affirmative. Because the defendant had a right to introduce Gardner's testimony for the purpose of challenging Perry's credibility, we conclude that the trial court abused its discretion in precluding Gardner's testimony concerning the effect of cocaine on the cognitive abilities of a person who ingests it.[9]

The defendant claims that the erroneous preclusion of Gardner's testimony violated his constitutionally protected right to present a defense. See, e.g., *State* v.

___

focuses exclusively on Gardner's failure to testify that it is more probable than not that a person under the influence of cocaine will suffer hallucinations.

[9] Because Gardner testified that it was more likely than not that, at the time of the shooting, Perry suffered from a cognitive impairment brought on by the ingestion of cocaine, we need not decide whether, or in what circumstances, such testimony might have been admissible even if Gardner had been unable to say that the probability of cognitive impairment due to cocaine use exceeds 50 percent.

*Edwards*, 234 Conn. 381, 388, 661 A.2d 1037 (1995); *State* v. *Carter*, 228 Conn. 412, 427–28, 636 A.2d 821 (1994). "In order to comport with the constitutional standards embodied in the confrontation clause, the trial court must allow a defendant to expose to the jury facts from which the jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. *Davis* v. *Alaska*, [415 U.S. 308, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974)] . . . ." *State* v. *Beliveau*, 237 Conn. 576, 585, 678 A.2d 924 (1996); *State* v. *Barnes*, 232 Conn. 740, 746, 657 A.2d 611 (1995). Thus, "[w]hen defense evidence is excluded, such exclusion may give rise to a claim of denial of the right to present a defense. *Chambers* v. *Mississippi*, [410 U.S. 284, 289–90, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)]." *State* v. *Christiano*, 228 Conn. 456, 474, 637 A.2d 382, cert. denied, 513 U.S. 821, 111 S. Ct. 83, 130 L. Ed. 2d 36 (1994); see also *State* v. *Cavell*, 235 Conn. 711, 720, 670 A.2d 261 (1996) ("under particular circumstances, the unjustified exclusion of a witness' testimony can amount to a deprivation of the defendant's right to present a defense"). "Whether a trial court's erroneous restriction of a defendant's or defense witness's testimony in a criminal trial deprives a defendant of his due process right to present a defense is a question that must be resolved on a case by case basis." *State* v. *Jones*, 205 Conn. 723, 731, 535 A.2d 808 (1988).

In the present case, the defendant sought to introduce Gardner's testimony to impeach Perry by casting doubt on her reliability as an eyewitness. Perry, however, admitted during her trial testimony that she had smoked cocaine immediately prior to the shooting and, on the basis of her acknowledged familiarity with the drug, the jury reasonably could have inferred that she was a frequent cocaine user. Perry further testified that she had been convicted of four felony offenses, including burglary and sale of narcotics. She also indicated that

she had been promised by the state that she would not be prosecuted for her admitted use of cocaine. Finally, the trial court did not in any way limit or restrict the defendant's opportunity to cross-examine Perry. In light of Perry's testimony, the jury had substantial reason to question her reliability and credibility. "[T]he constitution does not require that a defendant be permitted to present every piece of evidence he wishes." *State* v. *Christiano*, supra, 228 Conn. 474. We conclude, therefore, that the trial court's exclusion of Gardner's testimony was not an error of constitutional dimension.

We, nevertheless, must determine whether the trial court's improper exclusion of Gardner's testimony entitles the defendant to a new trial. In order to prevail, the defendant must establish that it is more probable than not that the erroneous evidentiary ruling affected the verdict. *State* v. *Cavell*, supra, 235 Conn. 721–22; *State* v. *Chapman*, 229 Conn. 529, 544, 643 A.2d 1213 (1994). We conclude that the defendant has not satisfied this burden.

We reach this conclusion for two reasons. First, Perry's version of the events surrounding the shooting was substantially corroborated by other eyewitnesses, each of whom was subject to a sequestration order. Lofton and Atkinson, who were both present at the shooting, gave testimony that coincided in all important details with Perry's account of the incident. Although each had a motive to lie; see part III of this opinion; the similarities between their testimony and Perry's account are significant and tend to diminish the likelihood that Perry's recollection of the shooting was affected by her use of cocaine. Furthermore, the most important element of her testimony—her identification of the defendant as the shooter—was corroborated by the statement given to the police by the defendant's girlfriend, June Davis, in which she reported that the defendant had admitted

to the shootings shortly after they occurred.[10] Finally, the state also introduced strong corroborative proof of the defendant's guilt. Specifically, the state's evidence established that the defendant had admitted to having owned an "SKS" Soviet-type assault rifle,[11] a search of the defendant's home the day after the shootings uncovered live 7.62 mm by 0.39 caliber ammunition, and a search of the defendant's car after the shootings revealed shell casings of the same type.

Second, as we have already indicated, the jury was aware of Perry's drug use, her heavy consumption of cocaine shortly before the shooting and her record of multiple felony convictions. Although Perry testified that she no longer felt the effects of the cocaine at the time of the shooting, she also testified that she did not initially realize that she had been shot and that at first she felt no pain. Moreover, the results of an electrocardiogram (EKG) taken shortly after Perry's admission to the hospital indicated that she may have been under the influence of drugs at that time, while an EKG taken several days later gave no such indication.[12]

Thus, although the jury was not aware of the exact nature and extent of the possible impairment to Perry's cognitive abilities stemming from her use of cocaine prior to the shootings, the defendant was able to adduce ample evidence tending to impugn her reliability as a witness. In light of the fact that Perry's account of the incident was also substantially corroborated, both by eyewitness testimony and by circumstantial evidence, we conclude that the defendant has not met his burden

[10] Although at trial Davis recanted this aspect of her statement, she did not deny initially having told the police that the defendant had admitted to the shootings. See part II of this opinion.

[11] The defendant, at trial, claimed to have sold that weapon prior to the shootings.

[12] It is noteworthy that the defendant emphasized these facts during his closing argument to the jury.

of demonstrating that it is more probable than not that the erroneous exclusion of Gardner's testimony affected the outcome of the case.

## II

The defendant next asserts that the trial court improperly precluded him from eliciting certain expert medical testimony regarding June Davis, another state's witness, on the ground that the testimony he sought to adduce was protected by the psychiatrist-patient privilege. General Statutes §§ 52-146d through 52-146j.[13] We disagree.

---

[13] General Statutes § 52-146d provides in relevant part: "Privileged communications between psychiatrist and patient. Definitions. As used in sections 52-146d to 52-146i, inclusive . . .

"(2) 'Communications and records' means all oral and written communications and records thereof relating to diagnosis or treatment of a patient's mental condition between the patient and a psychiatrist, or between a member of the patient's family and a psychiatrist, or between any of such persons and a person participating under the supervision of a psychiatrist in the accomplishment of the objectives of diagnosis and treatment, wherever made, including communications and records which occur in or are prepared at a mental health facility;

"(3) 'Consent' means consent given in writing by the patient or his authorized representative . . .

"(6) 'Patient' means a person who communicates with or is treated by a psychiatrist in diagnosis or treatment;

"(7) 'Psychiatrist' means a person licensed to practice medicine who devotes a substantial portion of his time to the practice of psychiatry, or a person reasonably believed by the patient to be so qualified."

General Statutes § 52-146e provides: "Disclosure of communications. (a) All communications and records as defined in section 52-146d shall be confidential and shall be subject to the provisions of sections 52-146d to 52-146j, inclusive. Except as provided in sections 52-146f to 52-146i, inclusive, no person may disclose or transmit any communications and records or the substance or any part or any resume thereof which identify a patient to any person, corporation or governmental agency without the consent of the patient or his authorized representative.

"(b) Any consent given to waive the confidentiality shall specify to what person or agency the information is to be disclosed and to what use it will be put. Each patient shall be informed that his refusal to grant consent will not jeopardize his right to obtain present or future treatment except where disclosure of the communications and records is necessary for the treatment.

"(c) The patient or his authorized representative may withdraw any con-

The following additional facts are relevant to our review of this claim. Davis, the defendant's girlfriend, testified for the state. On December 14, 1992, she told the Norwalk police that the defendant, upon arriving at her home shortly after the shootings, had admitted to firing the shots that struck McCrae and Perry. At trial, however, Davis testified that she had incorrectly reported the defendant's statement to her and that the defendant had, in fact, told her only that he had been in the car with the person who actually fired the shots.

On cross-examination, the defendant attacked Davis' credibility by eliciting testimony about her use of alcohol and drugs immediately before and after the defendant had arrived at her home. Davis testified that earlier in the evening, she had consumed ten beers and some peppermint schnapps, and that she had smoked a couple of marijuana cigarettes before the defendant's arrival. She also testified that her recollection of the evening was hazy and that she occasionally suffered blackouts when she drank alcohol. Davis further stated that she suffered from Hashimoto's thyroiditis and chronic panic phobia and that her physician had prescribed 0.25 mg of Xanax, to be taken up to five times a day, for her panic disorder. Finally, Davis testified that prior to giving her statement to the police, she had consumed three or four Xanax and some alcohol.

The two police officers to whom Davis gave her statement also testified for the state. They indicated that at the time Davis spoke to them, she did not appear impaired, she did not smell of liquor and there was no other indication that she was under the influence of drugs or alcohol. In addition, Davis' mother and a friend of Davis' both testified that Davis was a heavy drinker

sent given under the provisions of this section at any time in a writing addressed to the person or office in which the original consent was filed. Withdrawal of consent shall not affect communications or records disclosed prior to notice of the withdrawal."

who often appeared sober even after she had consumed excessive quantities of alcohol.

During the defense case, the defendant presented the testimony of Carl Mueller, a psychiatrist.[14] Mueller testified that he had received Davis' medical records from her treating physician, that he had reviewed those records, and that he had personally examined Davis prior to her trial testimony. Before the defendant could question Mueller further concerning any conclusions he may have drawn regarding Davis' medical condition, the trial court, sua sponte and outside the jury's presence, inquired of counsel whether Davis, who had returned to her home outside of the United States after completing her trial testimony, had waived her right to confidentiality under §§ 52-146d through 52-146j. The court was apprised that, although Davis had apparently signed a release for her medical records[15] and was aware that her examination by Mueller was for purposes of the defendant's trial, she had never expressly waived her confidentiality rights in open court. In light of these representations, the trial court concluded that Davis' willingness to submit to an examination by Mueller after having been informed of the reason for the examination was insufficient to constitute a waiver of the psychiatrist-patient privilege. Accordingly, the court precluded Mueller from testifying about anything he had learned as a result of his examination of Davis. Mueller was permitted, however, to testify generally about the effects of alcohol and Xanax on one who suffers from a thyroid condition such as Davis.' The trial court also ruled that Mueller could testify regarding what he had learned about Davis' thyroid condition as a result of his review of her medical records.

[14] The state did not challenge the expert qualifications of Mueller, a board certified psychiatrist and professor of medicine at Yale University School of Medicine.

[15] Davis had signed a release authorizing her treating physician to provide Mueller with copies of her medical records, and her physician did so.

Mueller then testified that Davis' thyroid condition enabled her to tolerate large amounts of alcohol without displaying the usual symptoms attendant to excessive alcohol consumption. Further, he explained that Xanax impairs cognition and memory, and that when used with alcohol, its effect on cognition is very significant, resulting in substantial impairment of one's ability to retain and remember facts.

The defendant claims that any information imparted by Davis to Mueller during his examination of her is not protected by the psychiatrist-patient privilege because any such communications were not undertaken within the framework of a therapeutic relationship as required by *Bieluch* v. *Bieluch,* 190 Conn. 813, 819, 462 A.2d 1060 (1983). The state, on the other hand, contends that the defendant's claim must be rejected in light of our holding in *State* v. *Toste,* 178 Conn. 626, 629–30, 424 A.2d 293 (1979), wherein we concluded that communications between a psychiatrist and a patient for the purpose of rendering a diagnosis are privileged unless those communications were undertaken pursuant to a court order; see General Statutes § 52-146f (4);[16] or the witness has expressly waived the privilege.

We need not today resolve any possible tension between our holdings in *Toste* and *Bieluch* because our

[16] General Statutes § 52-146f provides in relevant part: "Consent not required for disclosure, when. Consent of the patient shall not be required for the disclosure or transmission of communications or records of the patient in the following situations as specifically limited . . . .

"(4) Communications made to or records made by a psychiatrist in the course of a psychiatric examination ordered by a court or made in connection with the application for the appointment of a conservator by the probate court for good cause shown may be disclosed at judicial or administrative proceedings in which the patient is a party, or in which the question of his incompetence because of mental illness is an issue, or in appropriate pretrial proceedings, provided the court finds that the patient has been informed before making the communications that any communications will not be confidential and provided the communications shall be admissible only on issues involving the patient's mental condition. . . ."

review of the record reveals that the trial court's ruling did not preclude the defendant from introducing any relevant evidence. Mueller gave extensive testimony about the effect of Xanax, the combined effects of Xanax and alcohol and the effects of the two substances on a person suffering from Hashimoto's thyroiditis. Mueller also testified, on the basis of his review of Davis' medical records, that she suffered from Hashimoto's thyroiditis. Thus, the only testimony that Mueller was precluded from giving was the extent to which his own examination of Davis corroborated his conclusion, drawn from her records, that she was afflicted with thyroiditis. The state, however, never contested Mueller's diagnosis or the fact that Davis suffered from a thyroid condition. Thus, the record is clear that the defendant was able to establish through Mueller all of the material facts regarding Davis' medical condition that he would otherwise have been able to adduce had the trial court placed no limitation on Mueller's testimony. We conclude, therefore, that even if the trial court improperly precluded Mueller from testifying as to the information that he gleaned as a result of his examination of Davis, any such impropriety could not possibly have been harmful to the defendant.

### III

The defendant next asserts that the trial court improperly precluded him from eliciting testimony that would have tended to establish Lofton's motive for lying. The defendant claims error both in the trial court's restriction of his cross-examination of Lofton and in the court's exclusion of certain testimony by the defendant. We are not persuaded.

Certain additional facts are necessary to an understanding of our resolution of this issue. During the state's case-in-chief, Atkinson testified that he was a lieutenant in the Roots Brotherhood gang. He indicated

that he had known Lofton all his life, but that he was unaware whether Lofton was a member of the gang. Lofton testified that he was a member of the gang and that Atkinson was aware of that fact, but that he was unaware that Atkinson was a member. During his cross-examination of Lofton, the defendant attempted to establish Lofton's motive to lie about who had actually fired the shots by inquiring about the consequences of one gang member informing on another. The trial court sustained the state's objection on relevancy grounds, noting that because no evidence had yet been presented regarding the defense theory that Atkinson, and not the defendant, was the shooter, there was as yet no basis to assert that Lofton was lying and, accordingly, it was premature to establish any purported motive for his doing so.[17] The defendant then requested that Lofton be made available to testify as a defense witness following the defendant's testimony. The state agreed to this request.

The defendant thereafter testified that although he had been present in the car when the shots were fired, it was Atkinson, and not he, who fired the rifle. The defendant also sought to testify about the organization and practices of the Roots Brotherhood gang for the purpose of establishing that Lofton, as a member of that gang, had a motive to exculpate Atkinson and to inculpate the defendant. The trial court, however, precluded the defendant from testifying about the Roots Brotherhood gang on the ground that the defendant's

---

[17] We note that although the trial court ultimately sustained the state's objections to this line of inquiry, Lofton, in response to the defendant's questions and before the state could interpose its objections, responded that there would be severe consequences to him if he informed on a fellow Roots Brotherhood member and that he would be terminated from the organization for crossing another gang member. Although the trial court sustained the state's objections to these two responses, the state never requested that Lofton's answers be stricken.

knowledge about the group was based solely on hearsay.

After the defendant testified, Lofton was recalled as a defense witness, but he was asked only about Atkinson's home address at the time of the shooting. The defendant did not inquire about gang mores or otherwise seek to establish Lofton's motive to lie.

"The sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. *Greene* v. *McElroy*, 360 U.S. 474, 496, 79 S. Ct. 1400, 3 L. Ed. 2d 1377 (1959). Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. *State* v. *Lubesky*, 195 Conn. 475, 481–82, 488 A.2d 1239 (1985)." (Citations omitted; internal quotation marks omitted.) *State* v. *Colton*, 227 Conn. 231, 248–49, 630 A.2d 577 (1993).

"The confrontation clause does not, however, suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited through cross-examination. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Barnes*, supra, 232 Conn. 746. Thus, "[f]rom early times, it has consistently been held that it rests within the judicial discretion of the trial court whether to admit the impeaching statement where no foundation has been laid. . . . The trial court is vested with a liberal discretion as to how the inquiry should be conducted in any given case." (Citation omitted; internal quotation marks omitted.) *State* v. *Williams*, 204 Conn. 523, 534, 529 A.2d 653 (1987); *State* v. *Townsend*, 167 Conn. 539, 560, 356 A.2d 125, cert.

denied, 423 U.S. 846, 96 S. Ct. 84, 46 L. Ed. 2d 67 (1975); *State* v. *Mahmood,* 158 Conn. 536, 540, 265 A.2d 83 (1969); see also *State* v. *Plaza,* 23 Conn. App. 543, 548, 583 A.2d 925 (1990) ("[i]mpeachment of a witness for bias is a matter of right, but where no foundation has been laid by cross-examination of the witness who is under attack for bias, the decision to admit impeaching evidence is within the discretion of the court"), cert. denied, 217 Conn. 811, 587 A.2d 153 (1991). Moreover, it is well settled that questions of relevance are committed to the sound discretion of the trial court. *State* v. *Weidenhof,* 205 Conn. 262, 277, 533 A.2d 545 (1987).

The defendant contends that the trial court violated his confrontation clause rights by limiting his cross-examination into Lofton's possible motive to lie. This argument, however, reflects a fundamental misunderstanding of the trial court's ruling. The trial court concluded only that the defendant had not *as yet* laid the proper foundation for such cross-examination; at no time did the court indicate that the defendant was prohibited from renewing that line of questioning at an appropriate time. Thus, the record is unambiguous that the ruling of the trial court was a preliminary one, subject to reconsideration if and when the defendant established the relevance of the testimony that he sought to adduce from Lofton.[18] Because the defendant, upon recalling Lofton to testify, did not question him about his gang involvement, we can conclude only that the defendant chose not to pursue this line of inquiry. Furthermore, the defendant has advanced no argument to convince us that the trial court abused its discretion by requiring that the defendant establish a proper foundation before eliciting testimony from Lofton about his gang-related activities. Accordingly, the defendant's

---

[18] Indeed, it is clear from the defendant's request that Lofton remain available to testify for the defense after the defendant had himself testified that the defendant understood the preliminary nature of the court's ruling.

failure to renew his request after he had presented some evidence that Atkinson, and not the defendant himself, had fired the weapon, is fatal to his claim. See *State* v. *Johnson*, 214 Conn. 161, 169–70, 571 A.2d 79 (1990).

The defendant also maintains that the trial court improperly precluded him from testifying about the organization and operation of the Roots Brotherhood gang and, specifically, about the likelihood that the gang would retaliate against a member who provided information or testimony about a fellow member. We disagree. The trial court excluded the testimony not on relevancy grounds but, rather, because the defendant had no firsthand or independent knowledge of the gang or its activities. Indeed, the defendant does not contest the fact that his proffered testimony about gang practices was predicated on hearsay information. Evidence, though relevant, must still comport with the rules of evidence to be admissible. See, e.g., *State* v. *Alvarez*, 216 Conn. 301, 306, 579 A.2d 515 (1990). We conclude, therefore, that the trial court did not abuse its discretion in refusing to admit as hearsay this portion of the defendant's proffered testimony.

## IV

The defendant's final argument is that the trial court improperly denied his request to instruct the jury on reckless endangerment; General Statutes § 53a-63;[19] as a lesser included offense of attempted murder. We reject this claim also.

In his request to charge, the defendant sought jury instructions on manslaughter in the first degree; General Statutes § 53a-55 (a) (1) and (3);[20] as a lesser

---

[19] General Statutes § 53a-63 (a) provides: "A person is guilty of reckless endangerment in the first degree when, with extreme indifference to human life, he recklessly engages in conduct which creates a risk of serious physical injury to another person."

[20] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause

included offense of murder, and reckless endangerment in the first degree as a lesser included offense of attempted murder. Although the trial court granted the former request, it denied the latter, noting that this court has never required such an instruction.

In its charge to the jury, the trial court, after explaining the crime of murder, stated that "[i]f, however, you find the defendant not guilty of the crime of murder as charged in the first count, you should further consider whether or not the state has established the elements necessary for a finding of guilty as to the lesser included offense of intentional manslaughter in the first degree beyond a reasonable doubt." Following an explication of the elements of that crime, the court continued: "If you find the defendant not guilty of the crime of intentional manslaughter in the first degree, with regard to the death of Barbara McCrae, you may consider whether or not the state has proven the defendant guilty of the lesser crime of manslaughter in the first degree by reason of reckless indifference."

"The law governing the right of a defendant to an instruction on a lesser offense than that charged by the state is well established. 'A defendant is entitled to an instruction on a lesser offense if, and only if, the following conditions are met: (1) an appropriate instruction is requested by either the state or the defendant; (2) it is not possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser; (3) there is some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense; and (4) the

serious physical injury to another person, he causes the death of such person or of a third person; or . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

proof on the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater offense but guilty of the lesser.' [*State* v. *Whistnant*, 179 Conn. 576, 588, 427 A.2d 414 (1980)]." *State* v. *Chance*, 236 Conn. 31, 54–55, 671 A.2d 323 (1996).

In *State* v. *Rodriguez*, 180 Conn. 382, 407, 429 A.2d 919 (1980), we held that, in the context of a murder charge, "[f]or purposes of the second condition of *Whistnant* . . . an offense that would be a lesser included offense but for its requirement of a less culpable state of mind than that required for the greater, will be deemed a lesser included offense." See also *State* v. *Smith*, 185 Conn. 63, 77, 441 A.2d 84 (1981) (applying rationale to manslaughter and assault charges). The defendant claims that, in light of our holdings in *Rodriguez* and *Smith*, the trial court should have instructed the jury on reckless endangerment as a lesser included offense of attempted murder. We disagree.

As the Appellate Court correctly stated in *State* v. *Palmer*, 8 Conn. App. 496, 504, 513 A.2d 738, cert. denied, 201 Conn. 808, 515 A.2d 380 (1986), it is possible to commit the crime of attempted murder without also committing the offense of reckless endangerment. See also *People* v. *Ramirez*, 55 N.Y.2d 708, 710, 431 N.E.2d 623, 447 N.Y.S.2d 138 (1981). Notwithstanding our limited liberalization of *Whistnant* in *Rodriguez* and *Smith*, we have never abandoned the general rule that one crime is not a lesser included offense of another if the greater can be committed without a simultaneous commission of the lesser. See, e.g., *State* v. *Franko*, 199 Conn. 481, 494, 508 A.2d 22 (1986); *State* v. *MacFarlane*, 188 Conn. 542, 548, 450 A.2d 374 (1982). Indeed, we recently rejected an invitation to liberalize *Whistnant* further in *State* v. *Chance*, supra, 236 Conn. 53–56.

Furthermore, even if we were persuaded by the defendant's argument, reversal of his conviction for attempted murder would not be warranted in this case because we are satisfied that the jury would have reached the same result on that count even if it had received an instruction on reckless endangerment. There is nothing in the trial record to indicate, and the defendant does not claim, that the defendant had one state of mind relative to the shooting of McCrae and a different state of mind relative to the shooting of Perry. Although the jury was instructed with regard to the murder charge that it could convict the defendant of manslaughter under § 53a-55 (a) (3)—a crime for which the state of mind is recklessness—the jury nevertheless unanimously agreed that the state had established the defendant's intent to kill.[21] It cannot reasonably be contended, then, that the jury would have reached a different result in its deliberation on the attempted murder charge, even if it had been instructed on reckless endangerment. Cf. *State* v. *Hall*, 213 Conn. 579, 589, 569 A.2d 534 (1990) (failure to give self-defense instruction on lesser charge not harmful if jury rejected defense in considering greater charge).

The judgment is affirmed.

In this opinion the other justices concurred.

---

[21] Significantly, the jury was also instructed, under *State* v. *Sawyer*, 227 Conn. 566, 630 A.2d 1064 (1993), that it could not deliberate on any lesser offenses until it had unanimously concluded that the defendant was not guilty of murder. Although we have held that the improper failure to instruct on a lesser included offense is not harmless merely because the jury convicted the defendant of the greater offense; *State* v. *Monte*, 131 Conn. 134, 137, 38 A.2d 434 (1944); we have not had occasion to consider what effect, if any, a proper *Sawyer* instruction may have with respect to a claim under *Monte*. We need not address that specific question in this case.