******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BORDEN, J., concurring. I disagree with the majority regarding the claim by the defendant, Nathaniel Faust, that the trial court improperly instructed the jury on the issue of eyewitness identification. See part V A and B of the majority opinion.[1] I conclude, to the contrary, that the court should have given the instructions requested by the defendant. I agree, however, that the court's failure to give the instructions requested by the defendant constituted harmless error. Accordingly, I agree with the majority that the judgment of conviction should be affirmed.

The defendant challenges two aspects of the court's instructions on eyewitness identification. The first, discussed in part V A of the majority opinion, involved the weak correlation between a witness' confidence in his or her identification and its accuracy. The second, discussed in part V B of the majority opinion, involved the notion that eyewitness identifications become less reliable the longer the period of time between the initial observation of the alleged perpetrator and the identification.

I begin with some general background. As the majority opinion aptly notes, in *State* v. *Guilbert*, 306 Conn. 218, 49 A.3d 705 (2012), our Supreme Court substantially revised the law regarding eyewitness identifications. Significantly, the court in *Guilbert*, in noting "a near perfect scientific consensus"; id., 234–35; about the "array of variables that are most likely to lead to a mistaken identification"; id., 236; overruled two prior cases, namely, *State* v. *Kemp*, 199 Conn. 473, 507 A.2d 1387 (1986), and *State* v. *McClendon*, 248 Conn. 572, 730 A.2d 1107 (1999), both of which were premised on the notion that the factors regarding the reliability of eyewitness identification are within the common knowledge of jurors, indeed of the common experience of mankind; see *State* v. *Kemp*, supra, 479; *State* v. *McClendon*, supra, 586; and therefore a trial court had the discretion to exclude expert testimony on those factors. In their place, however, the court in *Guilbert* extensively reviewed the science of eyewitness identifications and held that appropriate expert testimony was now admissible in our trial courts; specifically, "the expert should be permitted to testify only about factors that generally have an adverse effect on the reliability of eyewitness identifications and are relevant to the specific eyewitness identification at issue" in the case. *State* v. *Guilbert*, supra, 248.

Central to the court's holding was the acknowledgement that many of the scientific findings regarding the factors affecting the reliability of eyewitness identification "are largely unfamiliar to the average person, and, in fact, many of the findings are counterintuitive." Id.,

239. Furthermore, although *Guilbert* on its facts involved only the question of the admissibility of expert testimony, the court also addressed the question of jury instructions: "a trial court retains the discretion to decide whether, under the specific facts and circumstances presented, *focused and informative jury instructions* on the fallibility of eyewitness identification evidence of the kind contemplated by the New Jersey Supreme Court [in *State* v. *Henderson*, 208 N.J. 208, 219, 27 A.3d 872 (2011)] would alone be adequate to aid the jury in evaluating the eyewitness identification at issue. We emphasize, however, that any such instructions should reflect the findings and conclusions of the scientific literature pertaining to the particular variable or variables at issue in the case; *broad generalized instructions on eyewitness identifications, such those previously approved by this court in State* v. *Tatum*, 219 Conn. 721, 734–35, 595 A.2d 322 (1991) . . . or those given in the present case . . . do not suffice." (Citation omitted; emphasis added; footnote omitted.) *State* v. *Guilbert*, supra, 306 Conn. 257–58.

With this background in mind, I turn now to the two specific instructional challenges raised by the defendant. The factual background relevant to the instructional challenges is as follows.

Rose Schroeder, an employee of the jewelry shop in the present case, Paul Lirot Jewelers in Madison, testified at the trial on June 21, 2012, that she could not identify any of the perpetrators of the robbery at the time of the robbery because they had worn masks and had instructed her to lie on the floor, keep her head down and not look at them. She also testified, however, that the night before the robbery, just after closing time, there was an incident during which she saw, about ten feet away through the store window, an African-American man exit a Mercedes vehicle and stand outside the door. She testified that she observed the man for approximately ten seconds. She testified further that eight or nine months after the robbery, the police showed her a set of photographs from which she identified the defendant as the man who had been outside the store the night before the robbery, and she also identified the defendant in the courtroom as that man. She also testified that at the time of the photographic identification she was very confident of her identification.[2]

Samantha Edwards belonged to the same Longmeadow, Massachusetts country club as Sally Suchy, who had testified previously that her Mercedes station wagon had been stolen from the club two days before the robbery, namely, on June 30, 2008. Edwards testified at the trial that on the day that the vehicle had been stolen, she was stopped at a traffic light in her vehicle while going into Longmeadow from Enfield when she saw Suchy's vehicle parked in a gas station at that

location. She testified further that Suchy's vehicle was being driven by an African-American male, whom she identified in the courtroom as the defendant. She also testified that, on August 17, 2010, she was shown a set of photographs by two Madison police officers, from which she identified the defendant as the person whom she had seen in Suchy's car on June 30, 2008.[3] She testified further that she had no doubts about that identification,[4] that she felt confident in the identification she had made,[5] and that she had no hesitation in identifying the defendant in the courtroom.[6]

### Certainty and Accuracy

After referring to the fact that both Schroeder and Edwards had identified the defendant, the defendant requested that the court charge as follows: "When the identification of a suspect connected to a crime is based upon the testimony of an eyewitness, the jury must use particular caution when deciding whether to credit that type of testimony. When assessing the credibility of testimony as it relates to the issue of the reliability of their identification, keep in mind that it is not sufficient that one or both of them are free from doubt as to the correctness of *her* identification of the defendant as the person whom they observed in connection with this investigation. . . . While the witness' level of certainty may be considered, bear in mind that certainty does not ensure accuracy; *in fact, it is now known that there is little correlation between a witness' degree of certainty and the reliability of the identification*." (Emphasis altered.)

The trial court charged in this respect as follows: "You may also consider the strength of the identification, including the witness' degree of certainty. Certainty, however, does not mean accuracy." Thus, the court, after instructing the jury that it may consider "the witness' degree of certainty," merely told the jury that "[c]ertainty . . . does not mean accuracy." The court's instruction omitted the critical part of the defendant's request, namely, that not only does certainty not mean accuracy, but that "it is now known that there is little correlation between a witness' degree of certainty and the reliability [or accuracy] of the identification."

This omission was improper because the critical part of the requested instruction both conformed to the overwhelming scientific consensus identified in *Guilbert* and was in accord with the law as stated therein. With respect to the science, the court in *Guilbert* noted the scientific consensus that "there is little if any correlation between confidence and accuracy"; *State* v. *Guilbert*, supra, 306 Conn. 242; and that "there is at best a weak correlation between a witness' confidence in his or her identification and the identification's accuracy . . . ." Id., 253–54. With respect to the law, the court stated that "[c]ourts across the country now accept that . . . there is at best a weak correlation between a wit-

ness' confidence in his or her identification and its accuracy . . . ." (Footnotes omitted.) Id., 237–39; see also *State* v. *Ledbetter*, 275 Conn. 534, 576, 881 A.2d 290 (2005) ("the correlation between witness confidence and accuracy tends to be weak"), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

Furthermore, by preceding its instruction regarding the relationship between certainty and accuracy with the instruction to the jurors that they "may also consider the strength of the identification, including the witness' degree of certainty," the court exacerbated the impropriety by inviting the jury to bring to the table precisely the type of jurors' misconception that had prevailed under the now abandoned *Kemp* and *McClendon* regime. Among the "widely accepted"; *State* v. *Guilbert*, supra, 306 Conn. 239; scientific findings noted in *Guilbert* is that "people often believe that the more confident an eyewitness is in an identification, the more likely the identification is to be accurate"; id., 240; yet, that belief, like so many of the others cited in *Guilbert*, is, although intuitive, simply not true. Id., 241. In addition, the science shows that, "although there is little if any correlation between confidence and accuracy, an eyewitness' confidence is the most powerful single determinant of whether . . . observers . . . will believe that the eyewitness made an accurate identification . . . ." (Internal quotation marks omitted.) Id., 242. Thus, although we now know that jurors tend to place their greatest weight on this unjustified belief, the jurors in the present case were implicitly invited to do precisely that by the court's instruction.[7]

I disagree with the majority that the court's anodyne instruction, namely, "[c]ertainty . . . does not mean accuracy," was a sufficient surrogate for the defendant's requested instruction that "it is now known that there is little correlation between a witness' degree of certainty and the reliability of the identification." In my view, it is one thing to tell jurors in general terms that "[c]ertainty . . . does not mean accuracy"—which does not specifically correlate with the known science and established law—and telling them in specific terms that "it is now known that there is little correlation between a witness' degree of certainty and the reliability of the identification"—which does so correlate. The two instructions to the jury are simply not the same, particularly when the first is immediately preceded by the invitation to bring their intuitive, although untrue, belief into play.

Put another way, I seriously doubt that the following conversation would have taken place in the jury room: "[Juror 1]: The judge told us that we can take the strength of the identification, including the level of certainty, into consideration. Following that instruction, I believe that the more certain a witness is—as both Schroeder and Edwards were—the more likely it is that

their identifications of the defendant were accurate. And, of course, the judge also told us that certainty does not mean accuracy; I understand that to mean that certainty does not necessarily mean accuracy, but that doesn't contradict my belief." "[Juror 2]: Oh, no. The judge also told us that certainty does not mean accuracy. That means that not only does certainty not necessarily mean accuracy, *but it's now known that there is a very weak correlation between certainty and accuracy. Therefore, your belief is simply wrong, and you cannot use it in our deliberations.*" (Emphasis added.) Where would that hypothetical Juror 2 get that thought from? Certainly not from anything the court told the jury.

### Time and Accuracy

The defendant also requested the following instruction: "[H]ow did the passage of time between the witness' viewing of the suspect and her subsequent identification of him in a police photo array procedure affect its reliability?—*as courts have recognized that the more time that goes by, the weaker the reliability of the identification.*" (Emphasis added.) In response, the court instructed the jurors simply: "[Y]ou [should] consider the length of time that's elapsed between the occurrence of the crime and the identification of the defendant by the witness." Thus, again, the court omitted the critical part of the defendant's instruction, namely, the specific warning "that the more time that goes by, the weaker the reliability of the identification."

As in the instruction on certainty and reliability, this omission was also improper because the critical part of the requested instruction both conformed to the overwhelming scientific consensus identified in *Guilbert* and was in accord with the law as stated therein. With respect to the scientific consensus, the court in *Guilbert* recognized that "a person's memory diminishes rapidly over a period of hours rather than days or weeks"; *State* v. *Guilbert*, supra, 306 Conn. 238; and "laypersons commonly are unaware of the effect of the . . . rate at which memory fades . . . ." Id., 241–42. With respect to the law, the court in *Guilbert* recognized that "[c]ourts across the country now accept that . . . a person's memory diminishes rapidly over a period of hours rather than days or weeks . . . ." (Footnotes omitted.) Id., 237–39.

And again, I disagree with the majority that the court's instruction as given was an adequate surrogate for the critical part of the defendant's requested instruction. Indeed, the court's general instruction, namely, that "you [should] consider the length of time that's elapsed between the occurrence of the crime and the identification of the defendant by the witness," does not even mention the words "reliability" or "accuracy," and does not tell the jury the critical scientific fact and established legal proposition regarding what specific consideration to give to that length of time. As in the case of

its instruction on confidence and accuracy, the court's all too general instruction lacked the specifics to make it truly informative. This is especially important in a case like the present one, in which the two sets of identifications were made so long after the initial observations of the defendant: in Schroeder's case, her photographic identification was made eight to nine months later; in Edwards' case, the in-court identification was made almost four years later, and her photographic identification was made almost twenty-six months later.

Nor am I at all persuaded by the majority's two assertions in support of its conclusion on this issue. The first is that "[t]he most reasonable conclusion that can be drawn from this instruction is that as time passes, a person's memory fades and their recollections become less reliable. We see no discernible difference between the substance of the court's charge and the defendant's request." I simply disagree. An equally reasonable conclusion jurors may draw from the uninformative general language in the court's instruction is that the individual jurors may treat the passage of time based on their own intuitions and perceptions of how time interacts with memory. Some jurors might well give credence to the oft-expressed inaccurate conventional wisdom, said colloquially as, "I can recall what happened last year, but I can't remember what I had for breakfast today," and reach the conclusion that it is just as likely that long-term memory can be better than short term memory as vice versa.

The second of the majority's assertions, closely related to the first, is that "it is well within the knowledge of the average juror that, as the months and years pass, an identification, like any other recollection of fact, may be based on faded memories rather than clear recollection. . . . As the purpose of a cautionary instruction, under *Guilbert*, is to notify the jury of established science that is contrary to common assumptions and not within the knowledge of the average juror, we cannot conclude that such an instruction was necessary in the present case." (Citations omitted.) I reject this assertion for four reasons.

First, it simply misreads *Guilbert*. The purpose under *Guilbert* of permitting expert testimony, and providing for the availability of properly tailored jury instructions, on the entire issue of the reliability of eyewitness identifications is not simply to isolate those factors that may or may not be within the supposed "knowledge of the average juror"; it is to guard against such thinking in the first place—that is, that courts should not rely on *our* assumptions of what "average jurors" know or do not know, and should rely, instead, on the science of eyewitness identification. That is why the court in *Guilbert* began by abandoning the *Kemp* and *McClendon* regime in the first place. See *State* v. *Guilbert*, supra, 306 Conn. 248–51. Second, and related to the

first, it reverts to that abandoned regime by creating, out of whole cloth, a juror assumption that conveniently fits the majority's conclusion, but for which the majority cites neither science nor law. Third, the assumption itself is questionable: as I indicate previously, many laypersons labor under the belief—which may in some instances be true but which is certainly not true in the case of an eyewitness identification—that sometimes long-term memory is better than short term. Fourth, the majority's assertion is based on the fact that such long times elapsed between the initial observations and the eventual identifications. This, of course, presents a paradigmatic case of the risk of mistaken identification. It bizarrely turns the whole scientific analysis on its head to say that, as the majority seems to say, the longer the time elapsed the less the need for a focused, specific instruction specifically conforming to both science and law.

## Harmless Error

Despite my disagreement with the majority regarding these two instructional claims, I agree with its conclusion that the defendant has not established a sufficient likelihood that the instructional errors were harmful to him. The basis for this conclusion is the DNA evidence tying the defendant convincingly to the crime, which has been ably detailed in the majority opinion. I therefore concur with the majority that the judgment should be affirmed.

[1] I agree with the majority's reasoning in rejecting the defendant's other claims.

[2] Specifically, Schroeder testified as follows:

"[The Prosecutor]: Were you confident with that identification?

"[Schroeder]: Very."

[3] This identification of the defendant from the photographic array was accomplished in two steps. First, Edwards identified the particular photograph from the array that she had chosen as being the driver of the Mercedes. Second, Detective Richard Perron, of the Madison Police Department, testified that the photograph Edwards chose was of the defendant.

[4] Specifically, Edwards testified as follows:

"[The Prosecutor]: Did you have any doubts about the identification that you made to the police?

"[Edwards]: No."

[5] Specifically, Edwards testified as follows:

"[The Prosecutor]: And do you feel confident in the identification that you made?

"[Edwards]: Yes. . . .

"[The Prosecutor]: Do you have any doubts about that as you sit here now—

"[Edwards]: No.

"[The Prosecutor]: —about the identification that you made?

"[Edwards]: No."

[6] Specifically, Edwards testified as follows:

"[The Prosecutor]: Did you have any hesitation in identifying the defendant today?

"[Edwards]: No, no."

[7] I reject the majority's assertion that the defendant induced error by including in his requested instruction the language: "the witness' level of certainty may be considered," and that, therefore, the trial court's instructions, namely, that the jurors "may also consider the strength of the identification, including the witness' degree of certainty," did not exacerbate the error. See footnote 10 of the majority opinion. It is true that the defendant's instruction did contain those eight words, but they must be read in context. And that context, which I quote in full in the text, is as follows: "While the

witness' level of certainty may be considered, *bear in mind that certainty does not ensure accuracy; in fact, it is now known that there is little correlation between a witness' degree of certainty and the reliability of the identification.*" (Emphasis added.) Thus, there is a world of difference between, on the one hand, the defendant's request, which reminds the jury that, in taking the certainty into consideration, it must know that there is little correlation between certainty and accuracy, and, on the other hand, the trial court's bald instruction that "You may also consider the strength of the identification, including the witness' degree of certainty," which contains no such warning about the lack of correlation between certainty and accuracy. Thus, the defendant's request does *not* invite the jury to bring to bear the type of jurors' misconception that had prevailed under *Kemp* and *McClendon*; the trial court's instruction *does*.

––––––––––––––––––––––––––––––